had reverses, and she had been working in her husband's factory in Europe, and they came to this country, where they had this factory, and Mr. Emery, of Emery & Beers, introduced us to one another, and told me, if I could give her some work, that they would like to have me do it; that is, Mr. Joseph H. Emery. They knew them in Europe, where they had an underwear business, and she knew a great deal about hosiery and underwear, because they are allied trades. And then we had at that time some stuff that came from the other side, some open-work stockings, came from either France or Germany, I do not know just where. They were very badly drop-stitched. They were simply terrible, and we did not know what to do with them; they were a great loss. It was a question what to do with them; we could not send them back, because that meant duty back and forth, so we thought to give them to some one, to some manufacturer or to Mrs. Handschin. Mrs. Handschin did not know whether she could do it; she had a place at Union Square; she had two girls I happened to see down there, Miss Dingman and then another girl. They were then very young girls. * * * We gave them to Mrs. Handschin, and she did the work so wonderfully, no one in the country could have done it, and I used to go to see her occasionally, and brought many styles to her; and we had some stockings that came from the other side, some embroidery, and open-work stockings we wanted on them. We had some orders that we could not get from France on time. I brought the samples down, and she took the work, and she did the work so well, I gave her the first pair of stockings to do at that time, done in this way.

"Q. You refer to open-work stockings? A. That was embroidered; she did this, and she did more work for us; that was in 1898, and then I saw them experimenting with open-work stockings at that time. They did not make any for us; but it was four or five years later that she made some, that we used for one of our annual December sales, which we used in quantities.

"Q. Did you, as a buyer for Lord & Taylor, have some open work done on stockings by Mrs. Handschin? A. Not as early as that?

"Q. When did you first have that done by her? A. I should judge about four or five years later; I could not tell you just when.

"Q. Four or five years after 1898? A. Yes.

"The Court: Q. Perhaps in or about 1903? A. I should judge so; I should judge that it was about that time. We used them in quantities for our annual December sale."

Catalogues or advertisements, 1908–1912, of Lord & Taylor (Exhibits M, N, and Q), were produced, which Miss Mayer was satisfied illustrated Mrs. Handschin's work. She also produced perforation designs given to her by Mrs. Handschin for reordering purposes. In brief, so satisfactorily was the prior public use established that further discussion (inter alia, the prior art) is unnecessary.

Bill dismissed, with costs.

---

**MARCHESE SISTERS EMBROIDERY CORPORATION v. GOTHAM SILK HOSIERY CO., Inc.**

(Circuit Court of Appeals, Second Circuit. May 15, 1922.)

No. 239.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by the Marchese Sisters Embroidery Corporation against the Gotham Silk Hosiery Company, Inc. From a decree dismissing the bill (282 Fed. 1005), plaintiff appeals. Affirmed.

Frackman & Robins, of New York City (James H. Griffin, Joseph H. Robins, and Mark Frackman, all of New York City, of counsel), for appellant.

Darby & Darby, of New York City, for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

PER CURIAM. Decree affirmed.

---

### CENTRAL UNION TRUST CO. OF NEW YORK v. EDWARDS, Collector of Internal Revenue.

(District Court, S. D. New York. May 25, 1922.)

**Internal revenue ⬥⟹9—Corporation tax; "capital stock."**

The tax imposed on corporations by Act Sept. 8, 1916 (Comp. St. § 5980a), is not a property tax, but an excise imposed on the privilege of doing business in corporate form as a going concern, and in measuring the value of its capital stock for purposes of the tax the good will of the corporation, its favorable contracts, amount of business done, and its profitable character are elements to be taken into consideration, as well as the value of its tangible property, less its debts.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Capital Stock.]

At Law. Action by the Central Union Trust Company of New York against William H. Edwards, Collector of Internal Revenue for the Second District of New York. Judgment for defendant.

Larkin, Rathbone & Perry, of New York City (John M. Perry, of New York City, of counsel), for plaintiff.

William Hayward, U. S. Atty., of New York City (Richard S. Holmes, Asst. U. S. Atty., of New York City, of counsel), for defendant.

GRUBB, District Judge. This case presents for decision the meaning of the words "capital stock," used in section 407, title IV, Excise Tax Act of September 8, 1916 (Comp. St. § 5980a). The plaintiff contends that the true meaning of the words is the paid-in capital, together with surplus and undivided profits, less liabilities, or the net value of the capital assets of the corporation, after deducting its debts. The collector applied a different method of reaching the value of the "capital stock" of the plaintiff corporation, and one which increased the amount of the tax due over that which would have been due according to the method contended for by the plaintiff. If the method contended for by the plaintiff is not a correct one, the plaintiff offers no criticism of that actually adopted by the collector; so that the single question presented is whether the method for which the plaintiff contends is the only proper one under the statute.

The method which the plaintiff says should have been adopted by the collector in measuring the tax takes into consideration only the net worth of the tangible assets of the corporation, and does not take into consideration such elements as franchises, good will, existing contracts,